|,MARION F. EDWARDS, Judge.
Defendant, Paul Will, appeals his conviction for aggravated kidnapping. For the following reasons, the defendant’s conviction is affirmed.
Defendant, Paul H. Will, was charged by indictment by the Jefferson Parish grand jury with aggravated kidnapping in violation of LSA-R.S. 14:44, which allegedly occurred on or between July 24 and 25, 2000. On September 13, 2000, Will was arraigned and pled not guilty. On July 25 and 26, 2001, the case was tried before a 12-person jury, which found Will guilty as charged. On August 24, 2001, Will filed a motion for entry of conviction of a lesser included responsive offense, which was denied. On November 16, 2001, the trial court sentenced Will to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On that same date, Will made an oral motion for appeal and filed a written motion for appeal that was granted.
On August 19, 2002, Will filed with this Court a motion and incorporated memorandum to stay appeal and remand for a hearing on plea bargain. On August 1325, 2002, this Court ordered the appeal to be stayed and remanded to the trial court for *141 an evidentiary hearing regarding the plea bargain to be held within 25 days of the order. On September 12, 2002, the State filed an application for writs of prohibition, mandamus and certiorari with the Supreme Court from the ruling of this Court. On that same date, the Supreme Court granted the application in part, stating:
Because it appears defendant’s Motion to Stay Appeal and Remand for a hearing on Plea Bargain was granted by order of a single judge of the court of appeal, it is ordered that the action be vacated and this matter remanded to the court of appeal for consideration of the motion by a three-judge panel. La. Const, art. V. Section 8(A) and (B).
On November 7, 2002, this Court ordered that the appeal be remanded to the trial court for an evidentiary hearing on the alleged plea agreement within 25 days of the order. This Court stated that upon completion of the hearing, the appeal should be relodged in this Court according to regular appellate procedure.
On December 6, 2002, an evidentiary hearing was held pursuant to this Court’s opinion.
At trial, Nicole Madere testified that, on July 24, 2000, she left home at approximately 6:45 a.m. and arrived at Lakeside Shopping Center in Metairie approximately 15 minutes later. She drove into the Lakeside Shopping Center parking lot facing Veterans Highway. Madere noticed a man, later identified as defendant, Paul Will, walking towards the right side of her car. ' Madere positively identified defendant, Paul Will, in court.
When she parked, Will was in the front of her car. Madere pulled into a parking spot and turned off the engine. She saw Will walking towards the driver’s side of her car. Madere opened her door slightly and went to grab her purse and lunch on the passenger’s seat. As she was getting ready to open the door, Will was standing in front of her pointing a gun at her. Will told Madere to “scoot over,” and she complied. . .
LWill then got into the driver’s side of the car, turned the engine on, and started driving. He kept asking Madere where the interstate was and how to get to Sli-dell. As they were getting ready to get on to the interstate across from Lakeside, Madere asked Will to let her off at the gas station next to the interstate. Will told her “No,” that she was just going to go for a ride, and that he did not want to take her ear away from her.
Madere stated that Will appeared to be in a hurry as they headed towards Slidell. Will asked her if she wanted to know what he was doing, and she told him that if he wanted to tell her he could. Will told Madere that he was living with his girlfriend, that he had taken in a woman, Juliet, who was in a lot of trouble, that some people Juliet knew had stolen $60,000 of his money, that he was not sure if his fiancée was in on it or not, and that he wanted to get wherever he was going to get his money back and take revenge on these people. At this point, Madere did not know where they were going, and Will did not give her any indication how long she' was going to be with him'. Madere testified that she was fearful.
Will and Madere first made a stop at a gas station in Mississippi, which had a Wal-Mart next to it. Madere did not exit the car as Will used her ATM card to get gas. Will had previously asked if she had any credit cards or debit cards, and Mad-ere told him she had a debit card. Madere testified that she gave the card to Will because she was scared. Will was never out of her sight, and she was never out of his sight. They drove a little while longer, *142 and then they stopped at an ATM and a gas station.
During the drive, Will told her how his uncle had passed away, that his father had died when he was very young, and that everything was going wrong for him. Madere did not ask him any questions at that time. When Will entered her car at Lakeside, he put the gun in the front pocket of his sweatshirt. Madere did not believe that Will up to this point had ever taken the gun out of his sweatshirt. | ¡When they stopped at the next gas station, she exited the car and Will followed her to the restroom.
As she was using the restroom, Will kept banging on the door because he could not get the ATM card to work. He kept telling Madere that she had given him the wrong number, however she had given him the correct PIN number right before they got out of the car. The restroom was a single restroom with just one door. There was no one else in the bathroom. There was no one else in the store at that point.
Will was angry, thought she was lying to him, and in a hurry to leave. Madere testified that approximately $60 was taken out of the ATM machine, with Will conducting the transaction. Madere did not feel at any point between the first two stops that she had the opportunity to escape. Early on in the trip, before they were getting ready to pull in somewhere or stop, Will expressed concerns that she might run away, and asked her if he needed to put her in the trunk. She told him “No” and that she would do whatever he asked of her.
Madere testified that the whole time she thought that “something really bad was going to happen.” Will and Madere drove on and stopped at a McDonald’s so that Will could get some breakfast. They went through the drive-through. At McDonald’s, Will asked Madere if she had any questions for him. She asked him where they were going, and he told her they were going to Philadelphia.
Madere stated that she never felt like she was safe, and wondered why he would keep her alive after he had told her what he was going to do. They stopped to get gas a couple more times. Madere identified State’s Exhibits 16, 17, and 18 as one of the gas stations where they stopped. She did not remember if she ever exited the car at that gas station. She identified State’s Exhibits 19, 20, and 21 as the last gas station where they stopped.
| ¡¡Madere testified that they had been following a car going very fast, that that car pulled off at the gas station, and that Will followed them. Will got gas, but she did not exit the car at that point. After they got gas, they pulled up to a parking area and they both got out and used the restrooms. When she entered the store to use the restroom, Will was right next to her. As she walked in, someone else was walking out. There was no one else in there. She was not able to get any assistance at the restroom. When she entered the restroom, she believed Will was right by the door. After they used the restrooms and went back to the car, Will was talking to the guys they had been following. Madere did not know the people and she did not see a license plate; it looked like a new car. Madere thought those people were “in on this,” that Will knew them, and that they were going to follow them.
Will had a conversation with those people, but she could not hear what they were saying. At this point, she did not know Will’s name. When Will got back into the car, he told Madere that they were getting closer. Madere thought she was getting closer to the end of her life. Madere identified State’s Exhibits 22, 23, and 24 as *143 the gas station where she had to sign her name on the receipt after they had gotten gas. They had to pay at a booth right next to the pumps. She testified that she had to sign the receipt because defendant asked her to. She felt like she had no choice.
At each of the stops, to the best of her knowledge, the gun was in Will’s pocket. Madere was afraid to get to Philadelphia because she knew that was the end of the trip, and that he was not going to let her go. They listened to the radio during the drive. They listened to her CD at first, and then they listened to a talk show that was discussing sex in a vulgar manner.
Madere did not attempt to change the station because she was scared and did not want to make Will angry. Will asked her if she had had sex, and if she was 17wearing underwear. Madere got “very, very nervous,” believing that Will was going to rape her. At some point during the trip, Madere drove the car because defendant asked her to and told her his back was hurting. At the gas station where she had to sign her name, Will asked her to drive, and she asked if she had to. Will said, “No,” and he drove. Ten minutes later, he pulled to the side of the road and told her she “really needed to drive.” At that point, she felt like she had to drive.
There were other stops made along the way prior to getting to Philadelphia. After Will ate the McDonald’s food, he stopped on the side of the road so he could use the restroom. She did not have her cell phone with her. He had taken her cell phone and her keys. She was not able to see him, but she did not look -to see where he went. She did not remember any other stops aside from the one after McDonald’s. After it got dark, the mood in the car was “very eerie.” Will dimmed the lights on the inside of the car.
At no point during the trip did Madere feel as though she had the opportunity to escape. She testified that she went on this trip because Will had a gun. When they arrived in Philadelphia, Will asked her where she wanted to be let off. He told her where he was going to leave her ear. She told him to let her off where there were a lot of people, like a hotel or airport, because it was late, approximately 1:30 or 2:30 a.m. Madere testified that she had never been to Philadelphia and was not familiar with it.
Will wanted to drop her off at a movie theater, but there was nobody there and it was already closed, so he pulled down one of the streets and stopped the car. After he stopped the car, nothing was said at first. She asked him if she could go. He told her, “Yeah,” and gave her her cell phone. He told her to call her mom and dad. The area where he dropped her off was dark; it looked like a downtown area. He said something about there being bars around there. There were no people milling about. She got out of the car and started running. She thought he was Isgoing to shoot her. She tried to call her mom and dad, but she could not dial the right number. She never looked back. Miss Madere testified that she was crying hysterically at that point.
She was completely numb and could not feel her legs, which made running harder. Madere ran to the corner and was banging on a door. A car pulled up with two guys. They asked her if she was looking for some place. She told them she needed to find the police and explained what had happened. They told her they had seen a police car around the block, so she got into the car with them. Madere called her home. When someone answered the phone, she had found the police. She talked to her parents. Miss Madere also talked to the police that night and told *144 them what had happened. She described Will’s clothing. When Will let her off, he was wearing a pair of light denim jeans, which he had changed into in the car. He changed into the clothes while he sat in the passenger’s seat and she was driving. Defendant had given her a sweatshirt when they were at the last gas station. The officers brought her to the police station in Philadelphia. A short while later they found Wih.
The police brought Madere to a convenience store to identify him, which she did. She was at the police station most of the night. Madere’s mother’s cousin came and picked her up. The trip with defendant lasted approximately 19 hours. Toward the end of the trip, Will was driving very fast, and swerving in and out of cars. At one point, he turned off the lights and drove along the shoulder of the road next to a truck to avoid a police car.
Throughout the trip, Madere never thought she had the opportunity to escape, and she only did what he said because he had a gun and she was terrified of him. She thought that her safety depended upon her compliance.
Will testified that his date of birth was May 28, 1973, that his father died before he was born, and that his mother, grandparents, and his uncle Charles, |9“Chick,” raised him. Will further testified that he earned his living by being a musician and a cook, that he started using drugs when he was 20 years old, and that he was a heroin and drug addict. Will testified that, after his uncle’s death, he decided to commit suicide by overdosing on heroin.
Will came to New Orleans on July 22, 2000 and slept on a bench. Will testified that he did not have any money to get back to Philadelphia. On July 24, 2000, a friend dropped off Will at Lakeside Shopping Center. He was inside the mall for approximately five minutes.
Will had found a gun in Philadelphia in the Potomac and realized that it was the only way he was going to get back to Philadelphia. He testified that he wanted to go back to Philadelphia to commit suicide because that was where his family was. When Madere pulled up in her car, she opened the door. Will waved the gun at her and asked her to scoot over, which she immediately did. As soon as he got into the car, he stuck the gun in his sweatshirt. Miss Madere asked defendant to let her go.
Will told Madere that to let her go, he would never get to where he was going. He promised not to hurt her and that he would let her go as soon as he got to where he was going. Will testified that Madere started crying. Madere showed Will how to get onto the interstate. When they did so, he started driving north. He remembered that their first stop was at a gas station in Picayune, Mississippi.
Miss Madere had asked to go to the bathroom. Will got gas while they were there and used her debit card to pay for it. When they stopped, Will realized the gun was loaded, so he put it under the seat without Madere seeing him. When they got to Mississippi, Will asked Madere if she had any money, but she did not. He asked her if she had a credit card. When he asked her for the card, he still had the gun in his sweatshirt pocket. He did not know she had a debit card before they got to Mississippi.
| inWiIl testified that he knew Miss Mad-ere was scared, and that he told her “hundreds” of times that he would not harm her. They made a lot of different stops. At one point, they stopped on the side of the highway. He went into the woods because he had “gone to the bathroom on himself’ and needed to wipe himself off. Will testified that he took the keys when *145 he left. He changed clothes inside the car because of that, covering himself with a towel as he did so. Will explained that he and Miss Madere talked about a lot of things, her parents, college, boyfriends and girlfriends, etc.
Will talked to Miss Madere about suicide many times. He testified that she was very supportive and said “a lot of really wonderful things.” Will admitted they were listening to a radio show where a man, who was pretending to be the DJ’s father, asked sexual-type questions. Defendant explained that he in turn asked Miss Madere those questions. He testified that he did not do that to frighten her. Defendant testified that, at one point, Miss Madere, on her own, talked about visiting a male strip club with some friends, and about being asked on a date by a guy who had given her a card.
Will admitted that he stopped talking when it got dark outside, which probably explained why Miss Madere testified that the mood changed at that point. Will asked her to drive twice for relief because he was withdrawing from 'heroin and had been awake for days. He testified that he could not see to drive anymore. Will further testified that he slept in the car for about 45 minutes. .He explained that Miss Madere did not look at him very much except when they were looking around at the scenery at one point and she made comments about how beautiful it was.
Will further testified that he was surprised each time when Miss Madere came back from the bathroom. At one point in the trip, they were traveling on the highway with another group of people and speeding. Will noticed that the other [near had a radar detector. Defendant communicated through the window to them that he wanted to go faster. They pulled into a large gas station, and defendant followed. They got into a conversation, and it turned out the people in the other car were going to South Philadelphia approximately two blocks from where his grandmother lived.
Will told them about a short cut to save almost two hours of driving. They were appreciative and offered to buy defendant and Miss Madere something to eat. Defendant thought he told them his name. Defendant testified that he did not know those people before he met them at the gas station. Will did not recall threatening to put Miss Madere in the trunk. He testified that he did not have to threaten her or restrain her because she did not threaten to run away. Will testified that he never even touched her.
Will learned Miss Madere had family in Philadelphia after they left New Orleans, but before they stopped in Mississippi. Defendant testified that he told her that was good - because she would have somewhere to go.. He claimed she did not know where her relatives lived, so he had to find a different place to drop her off. Defendant testified that as they got closer to Philadelphia, Madere was excited because she knew she was going to get dropped off. He explained. that he was going to drop her off at a theater complex, but it was closed. So he dropped her off downtown in Center City, where there were lots of people. He described the section of town as “good.”
Will stated that Madere asked to be let off somewhere busy, so he did that for her. Will testified that he dropped her off near a resort place called Penn’s Landing. He explained that he had seen two police officers-sitting in a car in the area where he let her. off. Will testified that Miss Mad-ere was wearing running shoes and a white T-shirt when he picked her up. He explained that the weather at 2:30 a.m. in Philadelphia was a lot colder than in New Orleans. Defendant | ^testified that that *146 was why he gave her the sweatshirt. He also gave her cell phone back and told her to call her mom and dad because they were going to be looking for her.
He knew she would be able to find the police. After dropping her off, Will was “kind of frantic” for 20 minutes or so. He went up Delaware Avenue to North Philadelphia to a place called Kensington and Lehigh, “where it’s pretty much like an open drug bazaar all hours of the day.” Will’s intention was to go there and buy enough heroin so he could overdose and die. Will did not have enough money at that time to do that. Will then picked up a black male to further his intention of buying drugs. He went to two ATMs because he still could not “properly function.” Will got $20.00 and he gave the black male that to test the drugs.
Will got arrested at the second ATM. The officers put him in a van and took him to a police station. Will testified that he told the officers he wanted to write two letters, one to his mom and one to Madere. The officers allowed him to do that. After that, defendant willingly gave a statement. Will testified that at the gas station shown in State’s Exhibits 19, 20, and 21, he and Miss Madere went to the bathroom. He further testified that there were a lot of people around, and that he saw people come out of the bathroom after Miss Mad-ere did.
Will further testified that he had never been arrested, and that he had never hurt anybody. He explained that he did not realize at the time how traumatic the incident was for Miss Madere, but that he realized it now. Will said that he did not realize it at the time because he was withdrawing from heroin and because he did not care about being alive anymore. He claimed that he did not ever demand anything from Miss Madere in order to let her go. He did not use his $60 to buy gas or food, because he was saving it to buy heroin in Philadelphia in order to commit suicide. Defendant testified that he could not get to Philadelphia without Madere because he knew she would have called the police.
11ftAfter hearing the testimony and evidence, the jury found defendant guilty as charged.
In his first assignment of error, Will asserts that the evidence at trial was insufficient to support a conviction for aggravated kidnapping. Will’s own admission at trial, however, constituted a judicial admission to second degree kidnapping.
Will specifically contends that the State failed to establish that he intended to seek ransom for the release of the victim, Nicole Madere. The State responds Madere was forced to give up her car and her debit card and travel to Philadelphia in order to secure her release. It argues, therefore, that the evidence was sufficient to support the conviction for aggravated kidnapping.
The standard for appellate review of the sufficiency of evidence is “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.”[1] Under Jackson, a review of a criminal conviction record for sufficiency of evidence does not require a court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. A reviewing court is required to consider the whole record and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt.[2]
*147 Will was charged with and convicted of aggravated kidnapping in violation of LSA-R.S. 14:44 which, in pertinent part, provides:
§ 44. Aggravated kidnapping
Aggravated kidnapping is the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender’s actual or apparent control:
114(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.
The crime of second degree kidnapping is set forth in LSA-R.S. 14:44.1 which, in pertinent part, provides:
§ 44.1. Second degree kidnapping
A. Second degree kidnapping is the doing of any of the acts listed in Subsection B wherein the victim is:
(1) Used as a shield or hostage;
(2) Used to facilitate the commission of a felony or the flight after an attempt to commit or the commission of a felony;
(3) Physically injured or sexually abused;
(4) Imprisoned or kidnapped for seventy-two or more hours, except as provided in R.S. 14:45(A)(4) or (5); or
(5)Imprisoned or kidnapped when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon.
B. For purposes of this Section, kidnapping is:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.
The difference between aggravated and second degree kidnapping is the intent to extort.[3]
When the State relies upon the “forcible seizing” provision of the aggravated kidnapping statute, the State is required to prove the following elements to establish the offense:
liBl. the forcible seizing and;
2. the carrying of any person from one place to another (the asportation element);
3. with the intent to force the victim, or some other person, to give up anything of apparent present or prospective value (the extortion element);
4. in order to secure the release of that person.[4]
On appeal, Will does not contest the State’s proof of the first and second elements. Rather, he claims the State presented no evidence that he had any intent to ransom the victim or that he required the victim or some other person to give up *148 something of value in order for the victim to be released.
In State v. Arnold,[5] the defendant was convicted of attempted aggravated rape, aggravated crime against nature, attempted second degree murder, and aggravated kidnapping. In that case, the defendant approached a female in a parking lot. As she was attempting to unlock the door of her truck, the defendant grabbed her by the hair and ordered her into the truck. During the entire drive, the defendant held a knife on the victim and told her if she did not comply with his demands, he would use the knife. The defendant attempted to rape the victim, but was unable to do so. He forced her to perform oral sex upon him. The defendant subsequently told the victim to leave the truck. As she did so, the defendant stabbed her in the neck. The victim managed to escape.
The issue on appeal in Arnold was whether a person, who forcibly seized and carried away another person with intent to rape her, can be found guilty of aggravated kidnapping, where there is not explicit communication by the kidnapper to the victim that she will only be released if she complied with his demands for sexual gratification, but the circumstances are such that a reasonable person would implicitly understand submission is the price for safe release.
11fiThe supreme court stated:
Thus, the crucial question in determining whether an aggravated kidnapping has occurred is not whether the defendant had intent to release the victim at either the outset of the crime or indeed at any point during the crime. The more important question and the issue to be focused upon is whether the defendant sought to obtain something of value, be it sex or money or loss of simple human dignity, by playing upon the victim’s fear and hope of eventual release in order to gain compliance with his demands.[6]
The supreme court in Arnold stated that it did not require evidence of explicit communication by the kidnapper to his victim. Rather, it found that the defendant’s threat to the victim that he would use the knife if she did not do what he ordered plainly manifested his intent to force her to give in to his sexual demands with the hope of securing her safe release.[7]
In State v. Roblow,[8] the defendant was convicted of two counts of aggravated kidnapping and one count of armed robbery. In Roblow, two sisters, M.S. and S.S., walked to their vehicle in a parking lot. Defendant walked up behind the women, pointed a gun at S.S., and told the women to get into the vehicle. Threatening to kill the women if they did not comply, he ordered them to drive him to Shreveport. Defendant told M.S. to stop and buy gas and to use their credit card, which they did. When the women asked defendant what he was going to do with them in Shreveport, he indicated he would possibly let them go. Defendant subsequently took the women to a motel and raped them. Afterwards, he directed M.S. to drive him to Shreveport. When they arrived, defendant told M.S. to stop the vehicle, and he got out.[9]
On appeal, the defendant in Roblow argued that the State presented no evidence *149 that he had any intent to ransom the victims or require someone to give up something of value in order for the victims to be released. The appellate court found that the State established the third element with proof defendant intended to |17force the victims to drive him to Shreveport and to engage in sexual relations with him. It stated in pertinent part:
The transportation and the sexual relations independently support a finding that defendant intended to force the victims to give up something of value. As we indicated in State v. James, 459 So.2d 1299, 1313 (La.App. 1st Cir.1984), writ denied, 463 So.2d 600 (La.1985), the phrase “anything of apparent present or prospective value” includes the situation where an offender forces a victim to transport the offender to a particular location.[10]
The appellate court in Roblow also concluded that the clear implication of defendant’s behavior was that the victims would be released safely only if they submitted to all of his demands.[11] It went on to state that the victims reasonably believed they would not be released safely unless they drove defendant to Shreveport and complied with his demand for sexual gratification upon arrival at the motel. In light of the foregoing, the appellate court found that the essential elements of the crime of aggravated kidnapping were proven beyond a reasonable doubt.[12]
Further, in State v. Roberts,[13] the defendant was convicted of aggravated kidnapping. In that case, the victim, Claudia Oliver, left a grocery store and walked back to her vehicle. As she was entering her vehicle, defendant approached Mrs. Oliver, pointed a gun at her head, and told her to get into the backseat. Another man, Wilson, got into the backseat and sat beside Mrs. Oliver. Defendant drove the vehicle out of the lot and told Mrs. Oliver they needed $5,000. She said she only had $250 and could write a check for that amount.[14]
She pleaded with the men not to harm her. Wilson responded that if she did not do anything “funny,” she would not be hurt. Wilson demanded all of the cash from Ms. Oliver’s wallet. They went to Mrs. Oliver’s bank where she wrote a | ischeck. Defendant drove to an apartment complex, demanded the change from Mrs. Oliver’s purse, and allowed Mrs. Oliver to get out of the vehicle. Wilson told Mrs. Oliver that they would return her vehicle to a place where she had originally parked.[15]
On appeal, the defendant in Roberts contended that the State failed to establish that he intended to force the victim to give up something of value in exchange for her release. The appellate court stated that when Wilson told the victim she would not be hurt if she did not do anything “funny,” those words prompted a belief that she would be safely released upon relinquishing the money, and that influenced her not to run or report the crime in progress to the bank teller. The appellate court found that, although the offenders did not expressly communicate to the victim that she would have to surrender money in order to be released, the victim understandably *150 perceived that her freedom was conditioned upon compliance with their demands. The appellate court found that the record supported the conviction for aggravated kidnapping, stating:
Viewing all of the evidence in the light most favorable to the prosecution, we find the trial court could have reasonably concluded that the defendant’s threatening actions manifested an intent to exploit the victim’s fear and force her to surrender something of value in the hope of securing a safe release.[16]
Based on the foregoing jurisprudence, we find that the State sufficiently established all the elements necessary to prove aggravated kidnapping. Will does not dispute that he forcibly seized and carried the victim from one place to another, thus satisfying the first two elements of the aggravated kidnapping statute. The State established the third element with proof defendant intended to force the victim to drive with him to Philadelphia. As was indicated in Roblow, supra, the phrase “anything of apparent present or prospective value” includes transportation.
[19The clear implication of Will’s behavior was that Madere would be released only if she submitted to all of his demands. Thus, we find sufficient evidence of the fourth element.
Will pointed a gun at Miss Madere and forced her to drive with him to Philadelphia. She asked to be released before they got onto the interstate; however, he told her, “No,” and that he would release her when he got to where he was going. Will asked Madere if he needed to lock her in the trunk to prevent her from escaping. He told her how individuals had stolen money from him and that he intended to take revenge on them. This caused Mad-ere to believe that Will was going to eventually kill her because she knew too much information. Will led Madere to believe that he had the gun in his front sweatshirt pocket during the entire trip. He questioned her regarding sexual matters, leading Madere to believe she was going to be raped. Will began conversing with individuals at one of the gas stations, which led Madere to believe that a group of people were in on the plan to abduct her.
All of these incidents caused Madere to fear defendant. In light of Will’s behavior, Madere reasonably believed she would not be released safely unless she drove with defendant to Philadelphia, used her debit card to pay for gas and food, and did not try to escape. Although Will -did not expressly communicate to the victim that she would have to surrender her debit card and travel with him to Philadelphia in order to be released, Madere understandably perceived that her freedom was conditioned upon compliance with his demands.
After a review of the record we find that, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime of aggravated kidnapping were proven beyond a reasonable doubt.
1 snln his second assignment of error, Will claims that he did not receive effective assistance of counsel because his attorney failed to inform him of a potential plea agreement to second degree kidnapping.
A claim of ineffective assistance of counsel is most appropriately addressed through an application for post-conviction relief, filed in the trial court where a full evidentiary hearing can be conducted, rather than direct appeal.[17] However, *151 when the record is sufficient, this court may resolve the issue on direct appeal in the interest of judicial economy.[18] After a review of the record, we conclude that this case is one in which the ineffective assistance of counsel claim would more appropriately be addressed by post-conviction relief. Accordingly, we decline to resolve this issue on direct appeal. Will may raise this issue in the trial court by application for post-conviction relief.[19]
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux,[20] and State v. Weiland.[21] The review reveals no errors patent in this case.
Accordingly, based on the foregoing, the defendant’s conviction is affirmed.
AFFIRMED.

. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979).

. State v. Lapell, 00-1056 (La.App. 5 Cir. 12/13/00), 777 So.2d 541, 545, writ denied, *147 00-3546 (La.9/14/01), 796 So.2d 675 and 01-439 (La. 1/4/02), 805 So.2d 1192.

. State v. Zihlavsky, 33,467 (La.App. 2 Cir. 6/21/00), 764 So.2d 250, 255, writ denied, 00-2434 (La.5/25/01), 792 So.2d 756.

. State v. Roblow, 623 So.2d 51, 57 (La.App. 1 Cir.1993), writ denied, 00-2188 (La.4/12/01), 789 So.2d 587 (citing State v. Arnold, 548 So.2d 920, 923 (La.1989)).

. 548 So.2d 920, 925 (La.1989).

. State v. Arnold, 548 So.2d at 925.

.Id. at 925.

. 623 So.2d 51, 53-54 (La.App. 1 Cir.1993), writ denied, 00-2188 (La.4/12/01), 789 So.2d 587

. Id.

. State v. Roblow, 623 So.2d at 57-58.

. Id. at 58.

. Id.

. 31,219 (La.App. 2 Cir. 9/23/98), 718 So.2d 1057, 1058-1059, writ denied, 99-1191 (La.9/24/99), 749 So.2d 627 and 01-1095 (La.1/4/02), 805 So.2d 1187,

. Id.

. Id.

. State v. Roberts, 718 So.2d at 1060.

. State v. McIntyre, 97-876 (La.App. 5 Cir. 1/27/98), 708 So.2d 1071, 1075, writ denied, 98-1032 (La.9/18/98), 724 So.2d 753.

. State v. Ratcliff, 416 So.2d 528 (La.1982).

. State v. Burnett, 33,739 (La.App.2d Cir. 10/04/00), 768 So.2d 783, writ denied, 2000-3079 (La.11/02/01), 800 So.2d 864.

. 312 So.2d 337 (La.1975).

. 556 So.2d 175 (La.App. 5 Cir. 1990).